101 P.3d 671

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Mark Alan MARTINS, Defendant–Appellant.**

**No. 25021.**

Intermediate Court of Appeals of Hawai'i.

Oct. 14, 2004.

As Amended Oct. 19, 2004.

Certiorari Granted Nov. 23, 2004.

Joyce K. Matsumori–Hoshijo, Deputy Public Defender, On the briefs, for defendant-appellant.

Simone C. Polak, Deputy Prosecuting Attorney, County of Maui, On the briefs, for plaintiff-appellee.

LIM and FOLEY, JJ.; and WATANABE, Acting C.J., Concurring in part and Dissenting in part.

Opinion of the Court by FOLEY, J.

Defendant–Appellant Mark Alan Martins (Martins) appeals from the March 1, 2002 Judgment of the Circuit Court of the Second Circuit (circuit court).[1] On May 19, 2000, Martins was indicted for the following offenses:

Count I, Terroristic Threatening in the First Degree, in violation of Hawaii Revised Statutes (HRS) § 707–716(1)(d) (1993);[2]

Count II, Reckless Endangering in the First Degree, in violation of HRS § 707–713(1) (1993);[3]

Count III, Place to Keep [Loaded] Firearm [on a Public Highway], in violation of HRS § 134–6 (Supp.2003);[4]

---

1. The Honorable Reinette W. Cooper presided.

2. Hawaii Revised Statutes (HRS) §§ 707–715(1) (1993) and 707–716 (1993) provide in relevant part as follows:

§ 707–715 **Terroristic threatening, defined.** A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:

(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

§ 707–716 **Terroristic threatening in the first degree.** (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:

. . . .

(d) With the use of a dangerous instrument.

(2) Terroristic threatening in the first degree is a class C felony.

3. HRS § 707–713 (1993) provides:

§ 707–713 **Reckless endangering in the first degree.** (1) A person commits the offense of reckless endangering in the first degree if the person employs widely dangerous means in a manner which recklessly places another person in danger of death or serious bodily injury or intentionally fires a firearm in a manner which recklessly places another person in danger of death or serious bodily injury.

(2) Reckless endangering in the first degree is a class C felony.

4. HRS § 134–6 (Supp.2003) provides, in relevant part, as follows:

§ 134–6 **Carrying or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty.**

. . . .

(c) Except as provided in sections 134–5 and 134–9, all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal

Count IV, Place to Keep Firearm, in violation of HRS § 134-6(c) (Supp.2003);

Count V, Place to Keep Firearm Ammunition, in violation of HRS § 134-6(c) (Supp. 2003); and

Count VI, Promoting a Detrimental Drug in the Third Degree, in violation of HRS § 712-1249(1) (1993).[5]

A jury found Martins guilty of the included offense of Terroristic Threatening in the Second Degree on Count I and the included offense of Reckless Endangering in the Second Degree on Count II. The jury found Martins guilty as charged on Counts III, IV, and VI. The State dismissed with prejudice Count V (Place to Keep Firearm Ammunition).

Martins was sentenced to one year of probation on each of Counts I and II, five years of probation on each of Counts III and IV, and six months of probation on Count VI, all terms to run concurrently. The circuit court imposed ninety days of jail confinement as a special term and condition of probation.

On appeal, Martins contends (1) the evidence was insufficient to sustain his conviction for Terroristic Threatening in the Second Degree; (2) the circuit court committed plain error in failing to instruct the jury that the threat had to be unequivocal, unconditional, immediate, and specific in order to fall under the prohibitions of the terroristic threatening statute; (3) the evidence was insufficient to establish that, as to the included offense of Reckless Endangering in the Second Degree, Martins' conduct recklessly placed another in danger of death or serious bodily injury; (4) the evidence was insufficient to establish that, as to the offense of Place to Keep [Loaded] Firearm [on a Public Highway], Martins possessed or carried in a vehicle a loaded firearm; (5) the evidence was insufficient to establish that, as to the offense of Place to Keep Firearm, Martins was in a place other than his place of business, residence, or sojourn; (6) the prosecutor's misconduct during closing arguments in asserting that it was illegal to reside in one's car in this jurisdiction substantially prejudiced Martins' right to a fair trial; and (7) there was insufficient evidence to establish the offense of Place to Keep Firearm.

## I.

The charges against Martins arose out of an incident that occurred on May 15, 2000. At that time, Martins was living in his car.

Martins testified that he had driven to Nakalele Point on the evening of May 14, 2000. Martins planned to target shoot on the 15th. At approximately 10:00 a.m. on the 15th, Martins assembled his shotgun and placed his targets. Martins heard motorcycles approaching and walked up a hill to get to high ground.

Hazel Cappal (Cappal), Wilbert Pascua (Pascua), and Ross Baybado (Baybado) (collectively, dirt bikers) were in the area to ride a dirt bike. Cappal testified that when she

hunter or firearm use training or instruction; or a police station. "Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

(d) It shall be unlawful for any person on any public highway to carry on the person, or to have in the person's possession, or to carry in a vehicle any firearm loaded with ammunition; provided that this subsection shall not apply to any person who has in the person's possession or carries a pistol or revolver and ammunition therefor in accordance with a license issued as provided in section 134-9.

(e) Any person violating subsection (a) or (b) shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134-9 shall be guilty of a class B felony. Any person violat-

ing this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony.

A conviction and sentence under subsection (a) or (b) shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under subsection (a) or (b) may run concurrently or consecutively with the sentence for the separate felony.

5. HRS § 712-1249 (1993) provides as follows:

§ 712-1249 Promoting a detrimental drug in the third degree. (1) A person commits the offense of promoting a detrimental drug in the third degree if the person knowingly possesses any marijuana or any Schedule V substance in any amount.

(2) Promoting a detrimental drug in the third degree is a petty misdemeanor.

and Pascua rode the dirt bike up a hill, they saw Martins. Martins repeatedly yelled at them, "[w]hat are you guys doing? Get off of my fucking land because of the cows are starving." The land was not owned by Martins; the owner was Maui Land and Pine.

Cappal testified that she and Pascua walked the bike back to the truck at the bottom of the hill; while they were waiting for Baybado, she heard eight gunshots. Pascua testified that he and Cappal walked and rode the bike back to the truck; Pascua heard six to eight gunshots while he and Cappal were at the truck. Cappal and Pascua testified that they were scared when they heard the gunshots. Baybado testified that while he was hearing the gunshots, he was running to Pascua's truck because he was scared he "might get shot or something."

The dirt bikers stopped at a vending stand on their way out, and Doreen Nakoa (Doreen), who ran the vending stand, called the police for the dirt bikers. When Martins drove by the vending stand about fifteen minutes later, Cappal got Martins' license plate number and gave it to the police.

The police stopped Martins' vehicle by the Honolua Bay lookout shortly thereafter, and the three dirt bikers identified Martins. Martins' car was towed to the Lahaina Police Station, and the police executed a search warrant on the car the following day. From the car the police recovered a Remington pump shotgun (not in a case), live ammunition and spent cartridge casings, a leafy vegetation believed to be marijuana, and a toiletry bag containing the components of a zip gun.

## II.

### A. Jury Instructions/Plain Error

 As a general rule, jury instructions to which no objection has been made at trial will be reviewed only for plain error.... [T]his Court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights.

*State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998) (citations omitted).

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. If the instructions requested by the parties are inaccurate or incomplete but are necessary in order for the jury to have a clear and correct understanding of what it is that they are to decide, then the trial court has the duty either to correct any defects or to fashion its own instructions.

Nevertheless, the trial court is not required to instruct the jury in the exact words of the applicable statute but to present the jury with an understandable instruction that aids the jury in applying that law to the facts of the case. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. If that standard is met, however, the fact that a particular instruction or isolated paragraph may be objectionable, as inaccurate or misleading, will not constitute ground for reversal. Whether a jury instruction accurately sets forth the relevant law is a question that this court reviews *de novo.*

Furthermore, error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Vanstory,* 91 Hawai'i 33, 42–43, 979 P.2d 1059, 1068–69 (1999) (internal quotation marks, citations, and brackets omitted; block quote format changed).

## B. Sufficiency of Evidence

We review the sufficiency of evidence on appeal as follows:

[E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Richie, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (quoting State v. Quitog, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Richie, 88 Hawai'i at 33, 960 P.2d at 1241 (internal quotation marks and citation omitted).

## C. Plain Error/Rule 52(b)

Hawai'i Rules of Penal Procedure Rule 52(b) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Therefore, an appellate court "may recognize plain error when the error committed affects substantial rights of the defendant." State v. Staley, 91 Hawai'i 275, 282, 982 P.2d 904, 911 (1999) (internal quotation marks and citation omitted).

The appellate court "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." Vanstory, 91 Hawai'i at 42, 979 P.2d at 1068 (internal quotation marks and citation omitted).

This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes. Id. (quoting State v. Kelekolio, 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993)).

## D. Ineffective Assistance of Counsel

The proper standard for claims of ineffective assistance of counsel on appeal is whether, "viewed as a whole, the assistance provided was within the range of competence demanded of attorneys in criminal cases." Dan v. State, 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994) (internal quotation marks, citation, and brackets omitted).

General claims of ineffectiveness are insufficient and every action or omission is not subject to inquiry. Specific actions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny. If, however, the action or omission had no obvious basis for benefitting the defendant's case and it "resulted in the withdrawal or substantial impairment of a potentially meritorious defense," then it will be evaluated as information that an ordinarily competent criminal attorney should have had.

Id. (ellipses and brackets omitted; emphasis in original) (quoting Briones v. State, 74 Haw. 442, 462–63, 848 P.2d 966, 976 (1993)). "[M]atters presumably within the judgment of counsel, like trial strategy, will rarely be second-guessed by judicial hindsight." Richie, 88 Hawai'i at 39–40, 960 P.2d at 1247–48 (internal quotation marks and citation omitted; emphasis in original).

## III.

## A. Evidence of Terroristic Threatening in the Second Degree

Martins contends the evidence was insufficient to sustain his conviction for Terroristic Threatening in the Second Degree (Terroristic Threatening Second) in violation of HRS § 707–717 (1993), which provides:

§ 707–717 Terroristic threatening in the second degree. (1) A person commits the offense of terroristic threatening in the second degree if the person commits ter-

roristic threatening other than as provided in section 707-716.

(2) Terroristic threatening in the second degree is a misdemeanor.

Relying on evidence of Martins' repeated discharge of his shotgun, the State argues there was sufficient evidence to sustain Martins' Terroristic Threatening Second conviction.[6]

■ Martins could not have been convicted of Terroristic Threatening Second based solely on the words he spoke, since Cappal, Pascua, and Baybado did not testify that they felt threatened or terrorized by Martins' words. To constitute terroristic threatening, spoken threats must be "sufficiently unequivocal, unconditional, immediate, and specific as to convey a gravity of purpose and an imminent prospect of execution." *State v. Chung*, 75 Haw. 398, 417, 862 P.2d 1063, 1073 (1993). The Hawai'i Supreme Court stated in *State v. Valdivia*, 95 Hawai'i 465, 24 P.3d 661 (2001), that "in a terroristic threatening prosecution, the prosecution must prove beyond a reasonable doubt that a remark threatening bodily injury is a 'true threat,' such that it conveyed to the person to whom it was directed a gravity of purpose and imminent prospect of execution." *Id.* at 476, 24 P.3d at 672. Martins' words alone did not constitute a "true threat."

Martins' words, combined with his conduct (repeated discharge of his shotgun), were sufficient evidence to sustain Martins' Terroristic Threatening Second conviction.

The testimony of the dirt bikers was that Martins yelled at them, telling them to get off his land, and then, a few minutes later, Martins repeatedly discharged a firearm six or eight times. The dirt bikers thought the discharge of the firearm was meant to scare them, and they were, in fact, scared. Baybado testified that he ran to Pascua's truck because he was scared he "might get shot or something."

We consider this evidence in "the strongest light for the prosecution." *Richie*, 88 Hawai'i at 33, 960 P.2d at 1241. We conclude there was "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support" the jury's verdict that Martins was guilty of Terroristic Threatening Second. *Id.* To be found guilty of Terroristic Threatening Second, there need only be sufficient evidence that Martins' words and conduct were "in reckless disregard of the risk of terrorizing" the dirt bikers. HRS § 707-715(1).

**B. Jury Instructions**

■ Martins contends the circuit court committed plain error in "failing to instruct the jury that the threat had to be unequivocal, unconditional, immediate, and specific" in order for the jury to return a guilty verdict on Terroristic Threatening Second.[7]

■ Martins did not object to the jury instructions. Jury instructions to which no objection has been made at trial will be reviewed only "to correct errors which seriously affect the fairness, integrity, or public

**6.** To be convicted of Terroristic Threatening in the First Degree (Terroristic Threatening First), the State had to prove, as the jury was so instructed, beyond a reasonable doubt that the discharge of the shotgun by Martins was "known to be capable of producing death or serious bodily injury." HRS § 707-700 (1993) (definition of "dangerous instrument"); *State v. Corpuz*, 10 Haw.App. 584, 591, 880 P.2d 213, 216 (1994). Apparently, the jury concluded that Martins did not use or intend to use his shotgun in that manner. Terroristic Threatening in the Second Degree (Terroristic Threatening Second) can be an included offense of Terroristic Threatening First. *Id.* at 590, 880 P.2d at 216.

**7.** The circuit court gave the following instruction as to Terroristic Threatening Second:

A person commits the offense of terroristic threatening in the second degree if, with the intent to terrorize or in reckless disregard of the risk of terrorizing another person, he threatens, by word or conduct, to cause bodily injury to another person.

There are two material elements of the offense of terroristic threatening in the second degree, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That, on or about the 15th day of May, 2000, in the County of Maui, State of Hawaii, Mark Alan Martins threatened by word or conduct, to cause bodily injury to Wilbert Pascua, Hazel Cappal, and Ross Baybado; and

2. That Mark Alan Martins did so with the intent to terrorize or in reckless disregard of the risk of terrorizing those persons.

reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *Sawyer*, 88 Hawai'i at 330, 966 P.2d at 642. Martins relies on language from the Hawai'i Supreme Court decision in *Chung* and notes that, with respect to spoken threats, the threats must be "sufficiently unequivocal, unconditional, immediate, and specific as to convey a gravity of purpose and an imminent prospect of execution." 75 Haw. at 417, 862 P.2d at 1073.

However, relying on its prior decision in *Chung*, the Hawai'i Supreme Court stated in *Valdivia* that "in a terroristic threatening prosecution, the prosecution must prove beyond a reasonable doubt that *a remark* threatening bodily injury is a 'true threat,' such that it conveyed to the person to whom it was directed a gravity of purpose and imminent prospect of execution." 95 Hawai'i at 476, 24 P.3d at 672 (emphasis added). Martins' reliance is misplaced, as *Chung* and *Valdivia* relate to threats by words. Because the evidence of terroristic threatening in this case was Martins discharging his shotgun in reckless disregard of the risk of terrorizing Cappal, Pascua, and Baybado, the circuit court did not plainly err in failing to instruct the jury that Martins' threat had to be a "true threat."

## C. Reckless Endangering in the Second Degree

■ Martins contends the evidence was insufficient to support his conviction of Reckless Endangering in the Second Degree because the State failed to establish, beyond a reasonable doubt, that his conduct recklessly placed another person in danger of death or serious bodily injury. Specifically, he asserts that the evidence was conflicting as to whether the area was populated and the evidence was insufficient to support that he shot in the direction of the highway. Reckless Endangering in the Second Degree, HRS § 707–714 (1993), requires:

§ **707–714 Reckless endangering in the second degree.** (1) A person commits the offense of reckless endangering in the second degree if the person engages in conduct which recklessly places another

person in danger of death or serious bodily injury.

(2) For the purposes of this section and in addition to other applications, **a person engages in conduct which recklessly places another person in danger of death or serious bodily injury when that person intentionally discharges a firearm in a populated area, in a residential area or within the boundaries or in the direction of any road, street or highway;** provided that the provisions of this paragraph shall not apply to any person who discharges a firearm upon a target range for the purpose of the target shooting done in compliance with all laws and regulations applicable thereto.

(3) Reckless endangering in the second degree is a misdemeanor.

(Emphasis added.)

■ When evaluating the sufficiency of evidence, we consider the evidence in the strongest light for the prosecution and evaluate whether there was "substantial evidence" (credible evidence which is of sufficient quality and probative value to support the conclusion of the trier of fact). *Richie*, 88 Hawai'i at 33, 960 P.2d at 1241.

Cappal testified that the area was a "well-populated area, I usually see tourists out there, but not very many tourists. And as far as that area where we were dirt biking, usually just dirt bikers go in that area." Doreen testified that during the day when she was at the vending stand, she saw four to five cars a day, averaging three to four people in each car, from a little before 12:00 until 4:30 p.m. Doreen also testified that she often saw people on motorcycles or dirt bikes riding in the area, more so on Mondays (May 15, 2000 was a Monday) and Fridays. From this testimony, the jury could have found that the area was populated.

Hawaii Revised Statutes § 707–714(2) requires that the shots be fired in a populated area *or* towards the direction of a highway. We conclude there was substantial evidence upon which the jury could have found that Martins discharged a firearm in a populated area.

## D. Place to Keep a Firearm

■ As to the offense of Place to Keep [Loaded] Firearm [on a Public Highway], Count III, Martins contends the evidence was insufficient to establish that he possessed or carried in a vehicle a loaded firearm and that he was in a place other than his place of residence or sojourn.

Martins asserts the evidence at trial failed to establish that the object in question was a firearm loaded with ammunition because the component parts of the zip gun (the firing mechanism, chamber, and barrel) recovered by the police from his vehicle did not constitute a firearm loaded with ammunition. However, the State's witness, David Hakes (Hakes), who was qualified as an expert in firearm identification, operation, function and use, testified that he had examined the component parts of the gun in question and would classify it as a zip gun (or homemade gun). Hakes testified that with a ram set charge in the chambered device, the zip gun would be considered to be loaded. In his testimony Martins conceded that, although the zip gun was in a bag and was broken down into three components, "there was a ball bearing in the barrel and a ram set in the end."

The fact that Martins' firearm was disassembled did not mean it was not a firearm. In *State v. Padilla*, 95 Wash.App. 531, 978 P.2d 1113 (Wash.App.1999), the Court of Appeals of Washington, in addressing the issue of whether a disassembled firearm constituted a firearm for the purpose of a possession offense, held that "a disassembled firearm that can be rendered operational with reasonable effort and within a reasonable time period is a firearm within the meaning of [Washington statute]." *Id.* at 535, 978 P.2d at 1115. In *People v. Hill*, 433 Mich. 464, 446 N.W.2d 140 (1989), the Michigan Supreme Court, in addressing the issue of whether two defendants could be charged with possession of a short-barreled shotgun when each defendant had in his possession one of the two component parts that comprised the short-barreled shotgun, held that "temporarily inoperable firearms which can be made operable within a reasonable time fall within the purview of the statutes that

govern the use and possession of firearms." *Id.* at 477, 446 N.W.2d at 146. In *State v. Rardon*, 185 Wis.2d 701, 518 N.W.2d 330 (Wis.App.1994), the Wisconsin Court of Appeals addressed the issue of "whether the possession of a disassembled and inoperable firearm by a person previously convicted of a felony is a violation of [Wisconsin statute]" where the applicable statutory definition provided that "firearm means a weapon that acts by force of gunpowder." *Id.* at 703 & 705, 518 N.W.2d at 330–31 & 331–32. The court specifically noted that many of today's weapons are easily taken apart and concluded that a "firearm is appropriately defined as a weapon that acts by force of gunpowder to fire a projectile irrespective of whether it is inoperable due to disassembly." *Id.* at 706, 518 N.W.2d at 332.

Therefore, there was credible evidence of sufficient quality and probative value to support the jury's finding that Martins possessed a loaded firearm. *See Richie*, 88 Hawai'i at 33, 960 P.2d at 1241.

■ Martins also contends the evidence was insufficient to establish that he was in a place other than his place of business, residence, or sojourn because he was living in his car at the time of the offense. Martins testified that he was driving his car on the road when he was stopped by the police. Martins was convicted of violating HRS § 134–6(d) for having in his possession a loaded firearm (the zip gun) without a license to carry in a vehicle on a public highway. The jury was specifically instructed that to find Martins guilty of Count III, it had to find beyond a reasonable doubt that Martins carried an unlicensed and loaded firearm in a vehicle on a public highway. There was substantial evidence to support Martins' conviction under Count III.

## E. Prosecutorial Misconduct and Ineffective Assistance of Counsel

■ As to Martins' conviction for possessing an unloaded shotgun under Count IV (Place to Keep Firearm in violation of HRS § 134–6(c)), Martins claims that the prosecutor committed misconduct by asserting twice in closing argument that it was illegal to

reside in one's car and thus prejudiced his right to a fair trial. Because Martins did not bring this to the attention of the circuit court by objecting to the prosecutor's comments, we apply the plain error standard of review in addressing Martins' claim of prosecutorial misconduct. Additionally, Martins argues that "[i]n the alternative, should the court find there was no prosecutorial misconduct herein, then [he] was denied a fair trial due to defense counsel's failure to object" because such failure resulted in the impairment of a potentially meritorious defense—thus amounting to ineffective assistance of counsel.

During the redirect examination of Detective Dadez, who executed the search warrant on Martins' car, the following exchange took place:

Q. [Prosecutor] Detective Dadez, is there any prohibition in this jurisdiction on living in one's car?

A. [Dadez] Yes, there is.

[Defense Counsel]: Your Honor, I would object, because as far as what the law is, it's the court that instructs the jury as to what the law is. It's not for witnesses to give their legal opinions about what the law is.

THE COURT: I'm going to sustain the objection.

At the ensuing bench conference, the circuit court heard further argument and then reaffirmed its ruling, stating:

THE COURT: I'm just—I have a problem with the detective now telling the jury what is the law, especially in areas where it's, you know, not alleged that he's violated any of those laws.

. . . .

You could submit your instructions to show that, you know, it's against the law to be living in a car with your guns or whatever, but I don't think that information needs to come from the detective.

In his closing argument, the prosecutor stated:

Now the law also states, and you are instructed, it is lawful to carry unloaded firearms. Again, this was loaded. But it has to be in an enclosed container, has to

be unloaded and in an enclosed container, and only listing specific areas, business, residence, or sojourn. You know sojourn, of course, is defined. Residence, pretty obvious.

The car is typically how you transport it. It is not legal to live in a car, therefore, a car cannot be a residence. Obviously not a place of business. These are establishments. These are structures.

. . . .

Place of sojourn, as I indicated, means a place, temporary—to live temporarily, as on a visit.

Say you are going over to Lana'i and you are sport shooting and you stay at the Manele Bay Hotel. Your room is your place of sojourn, so you keep your shotgun in your room. That is legal. That makes sense. It is not a car. It cannot be a car because it is against the law to live in a car.

Defense counsel did not object to the prosecutor's argument.

The circuit court instructed the jury on the offense of Place to Keep in Count IV as follows:

A person commits the offense of place to keep a firearm if he possesses a firearm in a place other than his place of business, residence, or sojourn, without a license to carry.

There are seven material elements of the offense of place to keep a firearm, each of which the prosecution must prove beyond a reasonable doubt.

These seven elements are:

1. That on or about the 15th day of May, 2000, in the County of Maui, State of Hawaii, Mark Alan Martins knowingly possessed the object in question; and

2. That the object in question was a firearm; and

3. That, at the time he possessed the object in question, Mark Alan Martins believed, knew, or recklessly disregarded the substantial and unjustifiable risk, that the object was a firearm; and

4. That, at that time, Mark Alan Martins was in a place other than his place of business, residence, or sojourn; and

5. That, at that time, Mark Alan Martins believed, knew, or recklessly disregarded the substantial and unjustifiable risk, that he was in a place other than place of business, residence, or sojourn; and

6. That, at that time, Mark Alan Martins did not have a license to carry; and

· 7. That, at that time, Mark Alan Martins believed, knew, or recklessly disregarded the substantial and unjustifiable risk, that he did not have a license to carry.

"Place of sojourn" was defined in the instruction given to the jury as "a place to live temporarily as on a visit; place to stay for a while." "Residence" was not defined in the instructions. After jury deliberations began, the jury foreperson forwarded Jury Communication No. 1, consisting of the following two questions, to the trial judge: (1) "What is the legal definition of residence?" and (2) "Can a vehicle legally be considered a sojourn or residence?" In response to the two questions, the trial judge and counsel had the following discussion:

[THE COURT]: The Court has discussed this with the attorneys.

And, [Mr. Prosecutor], what was your proposed response?

[PROSECUTOR]: That as far as jury question number one, the legal definition of residence, that we cannot provide them with one. Only a dictionary definition.

As to the second question, ... which was can a—

THE COURT:—Vehicle legally be considered a sojourn or residence?

[PROSECUTOR]: And that's in the context of Chapter 134, or the place to keep statutes. It cannot be considered. A vehicle cannot be considered a residence or place of sojourn. And that's based on not only analysis of the different sections in Chapter 134, but also on Section 291C–112 [8] of the Hawaii Revised Statutes, which prohibits persons from using any vehicle for purposes of human habitation, including dwelling place, living abode or sleeping place. And also *State v. Sturch*, 82 Hawai'i 269, 921 P.2nd [sic] 1170, Appellate 1996[,][i]nterpreted Section 291C–112.

THE COURT: [Defense Counsel].

[DEFENSE COUNSEL]: I think we have already hashed this out and I agreed with the Court's instruction that it is going to give.

THE COURT: All right. I believe that we cannot legally define "residence," there having been no instruction offered on what "residence" is. The only instruction is defendant's requested instruction residence, implying something more than mere physical presence, less than something—less than domicile. Residence is not synonymous with domicile. And while a person may have more than one residence, that person may have one legal domicile.

The Court refused that as argument. Other than that, no instruction was offered or suggested by the Court to be given, and I do not think we can now legally define residence for them, unless everybody agrees that a dictionary "residence" defini-

8. Hawaii Revised Statutes § 291C–112 (1993) provides:

§ 291C–112 **Certain uses of parked vehicles prohibited between 6:00 p.m. and 6:00 a.m.; definition; exceptions.** (a) No person shall use any vehicle for purposes of human habitation, whether or not the vehicle is designed or equipped for that purpose, while the vehicle is parked on any roadway, street, or highway or other public property between the hours of 6:00 p.m. and 6:00 a.m. or while the vehicle is parked on private property without authorization of the owner or occupant authorizing both the parking of the vehicle there and its use for purposes of human habitation.

(b) As used in this section "purposes of human habitation" includes use as a dwelling place, living abode, or sleeping place.

(c) This section does not apply to the parking of vehicles and their use for purposes of human habitation in parks, camps, and other recreational areas in compliance with law and applicable rules and regulations, or under emergency conditions in the interest of vehicular safety.

(d) The department of health shall promulgate rules and regulations, pursuant to chapter 91, necessary for the administration of this section.

tion goes in, which not all parties are agreeing.

As to the second question, can a vehicle legally be considered a sojourn or residence. The Court believes that the jury is asking the Court to decide, you know, an issue before them. So it declines to do so. What the Court's response will be is, "Please refer to all of the jury instructions that you have received in this case." Okay?

[DEFENSE COUNSEL]: Yes, your Honor.

THE COURT: All right. I'm going to send that in. I have signed it, dated it, and it's now 2:41 p.m.

(Footnote added.)

█ It was for the court, not counsel, to instruct the jury regarding the law applicable to the facts of the case. Hawaii Rules of Evidence Rule 1102; *State v. Hatori*, 92 Hawai'i 217, 220, 990 P.2d 115, 118 (App.1999). The circuit court invited the prosecutor to submit a jury instruction that "it's against the law to be living in a car with your guns" when the circuit court sustained defense counsel's objection to the prosecutor's question to Detective Dadez on this issue. The prosecutor did not submit such an instruction and only belatedly suggested one by referring to HRS § 291C–112 in response to the jury's question on whether a vehicle would be legally considered a sojourn or residence.

█ The prosecutor's argument, however, was not an incorrect statement of law, as in *State v. Mahoe*, 89 Hawai'i 284, 290, 972 P.2d 287, 293 (1998).[9] As such, the prosecutor's statements that "a car cannot be a residence" and "it is against the law to live in a car" did not "seriously affect the fairness, integrity, or public reputation of judicial proceedings" arising to the level of plain error. *Vanstory*, 91 Hawai'i at 42, 979 P.2d at 1068. Additionally, we conclude Martins' claim of ineffectiveness of counsel on this point is without merit. Martins has not met his burden of demonstrating that his counsel's failure to object to the prosecutor's comments

"resulted in the withdrawal or substantial impairment of a potentially meritorious defense." *Briones*, 74 Haw. at 462–63, 848 P.2d at 976.

### F. Sufficient Evidence of Place to Keep Firearm

Martins argues there was insufficient evidence to sustain his conviction under Count IV, Place to Keep Firearm, because his car was his residence or place of sojourn. This argument is without merit.

### IV.

The March 1, 2002 Judgment of the Circuit Court of the Second Circuit is affirmed.

Concurring and Dissenting Opinion by WATANABE, J.

In my opinion, the circuit court plainly erred when it failed to provide a "true threat" instruction to the jury, as required by *State v. Valdivia*, 95 Hawai'i 465, 478, 24 P.3d 661, 674 (2001).

In its answering brief, Plaintiff–Appellee State of Hawai'i (the State) concedes that the words uttered by Defendant–Appellant Mark Alan Martins (Martins) to Wilbert Pascua (Wilbert), Ross Baybado (Ross), and Hazel Cappal (Hazel) "do not constitute a 'threat' prohibited by the terroristic threatening statutes as they do not involve 'specific threats of physical injury to others.'" Answering Brief at 21–22. The State also acknowledges that

[t]he offense of Terroristic Threatening ("TT"), by its statutory language, requires at the very least words which "threaten" some form of bodily injury. Clearly, such was not the case with the words [Martins] yelled, and no testimony existed from Wilbert, Hazel, or Ross that they felt "threatened or terrorized" after [Martins] yelled at them. Therefore [Martins] could not have been convicted for TT2 by the jury based upon his words he spoke.

*Id.* at 22 (citation omitted). According to the State, it

---

9. The term "residence" in HRS § 134–6 "must be construed with reference to" HRS § 291C–112 in that the two sections are *in pari materia*.

*State v. Murray*, 63 Haw. 12, 23, 621 P.2d 334, 341 (1980).

is not arguing that the threat must always be specific and could never be implied. For instance, the same words spoken by [Martins] in the case at bar, "get off my f-ing land, you're killing the cows," simultaneously accompanied by some shaking of the fist, or some other conduct which, in and of itself would not constitute a threat, could nevertheless "imply" consequences resulting in bodily injury. *Under those circumstances, a "true threat" definition would be required.*

*Id.* (citation omitted; emphasis added).

A review of the record reveals that the circumstances that the State admits would trigger the requirement for a true threat definition are present in this case. The State's terroristic threatening case against Martins was premised on both Martins' words and subsequent conduct in firing gunshots. Indeed, the deputy prosecutor argued in closing arguments:

> Now, they all testified to you that they were frightened. In fact, Ross indicated he thought he was going to get shot. And probably Hazel was the one that was most upset by the behavior. But all three were frightened and all three testified to that fact. They were, in fact, terrorized. *And it wasn't just by the guns,* although the gun, of course, basically was the operative force here that caused them to be very much afraid. *But it was also the first thing that set them off, was the conduct.*
>
> *The words and conduct. Individual sitting on top of a hill, yelling at them, swearing at them, "Get off my f'ing land, you are killing the cattle." Other inappropriate things like that.* ...
>
> That upset them initially. But they were being pragmatic. They were going to go back down to the truck and wait. But when the gun started to go off, that's when they all became frightened.
>
> Now, actions speak louder than words.

Tr. 12/19/01 at 31–32 (emphases added).

In light of the evidence adduced below, I believe it was incumbent on the circuit court to instruct the jury that Martins' threats, by words or conduct, had to be "unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *State v. Chung,* 75 Haw. 398, 416–17, 862 P.2d 1063, 1073 (1993) (quoting *United States v. Kelner,* 534 F.2d 1020, 1026–27 (2d Cir.1976), *cert. denied,* 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976)). I would therefore vacate Martins' conviction for Terroristic Threatening in the Second Degree and remand for a new trial on that offense. In all other respects, I concur with the majority opinion.